**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION**

| | | |
|---|---|---|
| RAY COMMUNICATIONS, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 2:08-cv-24-BO |
| | § | |
| CLEAR CHANNEL COMMUNICATIONS, | § | |
| INC., CLEAR CHANNEL | § | |
| BROADCASTING, INC., | § | |
| KATZ MEDIA GROUP, INC., and | § | |
| KATZ COMMUNICATIONS, INC. | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56(c), Defendants Clear Channel Communications, Inc., Clear Channel Broadcasting, Inc., (collectively, "Clear Channel"), Katz Media Group, Inc., and Katz Communications, Inc.[1] (such entities, together with Clear Channel, "Defendants") have filed their motion for summary judgment on their affirmative defenses of laches, acquiescence, and abandonment, and, in the alternative, for partial summary judgment dismissing any claim of the Plaintiff for damages. Defendants submit the following arguments and authorities in support of that motion.

## I.  PRELIMINARY STATEMENT

1.  Ray Communications, Inc. ("Plaintiff") filed suit against Defendants alleging infringement of Plaintiff's federally registered AGRINET trademark.[2] Defendants have asserted the affirmative defenses of laches, acquiescence, and abandonment.[3] As a matter of law, Defendants are entitled to summary judgment on their affirmative defenses because Plaintiff has failed to assert its alleged trademark rights and/or permitted Defendants, their predecessors, and various third parties to use

---

[1] Katz Communications, Inc. joins in Defendants' Motion for Summary Judgment as a Defendant subject to the pending Defendants' Motion to Strike Plaintiff's First Amended Complaint (Docket No. 85). Katz Media Group, Inc. and Katz Communications, Inc. are referred to herein collectively as "Katz."

[2] Compl. (Docket No. 1) ¶¶ 14, 16; First Am. Compl. (Docket No. 84) ¶¶ 15, 17.

[3] Answer (Docket No. 36) ¶¶ 24–26; Answer to Pl.'s First Am. Compl. (Docket No. 87) ¶¶ 25–27.

1

allegedly infringing marks combining the term "Agrinet" with a geographic identifier (the "Agrinet Marks")[4] for a period of decades, without any license agreement with Plaintiff that would protect or preserve its trademark rights in connection with such use. Permitting Plaintiff to now maintain a cause of action against Defendants for such long-standing uses would cause undue prejudice to Defendants. Moreover, as is also subject of Defendants' pending cancellation proceeding before the United States Patent and Trademark Office's Trademark Trial and Appeal Board,[5] Plaintiff's failure to protect its rights in the AGRINET mark, by allowing multiple third parties to use Agrinet Marks without license or restriction, has resulted in Plaintiff's abandonment of any right to exclude others from using the AGRINET mark. Finally, Plaintiff's inconsistent, incomplete, arbitrary, and speculative theory(ies) of damages are not sufficient for a jury to consider as the basis for any monetary award; consequently, in the alternative, Defendants seek partial summary judgment dismissing Plaintiff's claims for monetary relief.[6]

## II.    FACTUAL BACKGROUND

2.       "Agrinet" is short for "agricultural network" and has been used to refer to the broadcast of agricultural news at various times of day from a central location to a network of affiliated radio stations. Although Plaintiff is the current owner of a federal registration of the AGRINET service mark, Clear Channel, its predecessors, and other third parties have used Agrinet Marks for various time periods over a span of three decades to identify their own agricultural radio news networks, all without license or other agreement with Plaintiff or its predecessor in interest. Now, Plaintiff has filed this lawsuit asserting claims of trademark infringement against Defendants for their use of Agrinet Marks that has been ongoing for more than thirty years.

---

[4] Examples include OKLAHOMA AGRINET, TENNESSEE AGRINET, AGRINET OF THE HIGH PLAINS, KENTUCKY AGRINET, SOUTHEAST AGRINET, and the like.

[5] The cancellation proceeding against Plaintiff's federal trademark registration of AGRINET has been during the pendency of this suit.

[6] Although this is a trademark infringement case, Plaintiff's Complaint also asserts (without any specificity) a claim for alleged violation of the North Carolina Unfair and Deceptive Trade Practices Act. First Am. Compl. (Docket No. 84) ¶¶ 18-24. Because Plaintiff's claim is based on nothing other than the "aforesaid acts and practices", which consist only of Plaintiff's general allegations of trademark infringement, it necessarily follows that a judgment in favor of Defendants on Plaintiff's trademark claims would fully justify judgment in favor of Defendants on Plaintiff's bald, derivative deceptive trade practices claims.

3087332.3

### A. Plaintiff, Defendants, and third parties have used various Agrinet Marks for more than three decades.

3. In the 1970s, Plaintiff's predecessor, Charlottesville Broadcasting Corporation ("Charlottesville Broadcasting"),[7] began using the mark AGRINET to identify agricultural radio news network broadcasts in Virginia. Helm Decl. ¶ 4 & Ex. L (W. Ray Dep. 14:1-11, May 11, 2010). Charlottesville Broadcasting registered the AGRINET mark with the United States Patent and Trademark Office in 1972 for use in connection with "educational services rendered through the medium of radio; namely, a program of interest to farmers." Helm Decl. ¶ 5 & Ex. Y (AGRINET registration).

4. Also in the 1970s, Clear Channel's predecessors independently began using the service marks OKLAHOMA AGRINET,[8] TENNESSEE AGRINET,[9] and KENTUCKY AGRINET[10] to identify their respective agricultural radio news network broadcasts in the Oklahoma, Tennessee, and Kentucky areas, respectively. Helm Decl. ¶ 4 & Exs. M (Hays Dep. 17:22-18:2, 20:24-21:6, May 17, 2010), R (Storey Dep. 12:16-22, May 25, 2010), X (Crowner Dep. 33:17-34:9, 40:18-22, Jul. 5, 2010); & ¶ 9 & Ex. OO1 (NAFB Membership Directory, 1978), ¶8 & Ex. NN2 (AgriMarketing Magazine Marketing Services Guide, 1979).

5. In 1978, Clear Channel's predecessor in Oklahoma, Covenant Broadcasting Corporation, registered the mark OKLAHOMA AGRINET with the Oklahoma Secretary of State. Helm Decl. ¶ 4 & Exs. P (Parrish Dep. 43:9-44:25, May 18, 2010), and ¶ 5 & Ex. BB (SAEGIS Custom Search Report, Registration No. 15,009).

---

[7] Charlottesville Broadcasting evidently assigned its rights in the AGRINET mark to Plaintiff in 1986. Declaration of Marissa Helm, ¶ 6 & Ex. DD, Aug. 9, 2010. The August 9, 2010 declaration of Marissa Helm ("Helm Decl.") is attached hereto and incorporated herein by reference.

[8] Clear Channel, through Insilco Broadcasting Corp. of Oklahoma, Inc., acquired the property known as the Oklahoma Agrinet, operating as part of the Oklahoma News Network (including intangible assets such as trademarks and goodwill), from Broad Street Communications Corp. on October 1, 1984. Helm Decl. ¶ 7 & Ex. KK.

[9] Clear Channel acquired the property known as the Tennessee Agrinet (including intangible assets such as trademarks and goodwill) from Paxson Communications Corp. in Fall 1997. Helm Decl. ¶ 4 & Exs. R (Storey Dep. 8:24-9:3, May 25, 2010), and X (Crowner Dep. 78:7-79:14, Jul. 5, 2010).

[10] Clear Channel acquired the property known as the Kentucky Agrinet, operating as part of the Kentucky Network (including intangible assets such as trademarks and goodwill), from The American Network Group, Inc. on January 31, 1992. Helm Decl. ¶ 7 & Ex. MM.

3

6.     Clear Channel Communications, Inc. registered OKLAHOMA AGRINET with the Oklahoma Secretary of State in 1990 (which registration was later transferred to Clear Channel Broadcasting, Inc.), and that registration was renewed in 2000, 2005, and 2010.  Helm Decl. ¶ 5, Ex. Z (Oklahoma Trademark Registration No. 23247 and renewal Trademark Registration Nos. 30902 and 12005904).

7.     Since the late 1970s, OKLAHOMA AGRINET and TENNESSEE AGRINET have been used continuously in these respective regions by Clear Channel and its predecessors.  *See, e.g.*, Helm Decl. ¶ 4 & Exs. M (Hays Dep. 22:25-23:8, May 17, 2010), O (West Dep. 14:15-23, May 18, 2010), R (Storey Dep. 72:2-7, May 25, 2010), and X (Crowner Dep. 41:3-6, Jul. 5, 2010).  KENTUCKY AGRINET was used continuously in the Kentucky area by Clear Channel and its predecessors from the late 1970s until in or about 1993.  Helm Decl. ¶ 4 & Ex. X (Crowner Dep. 18:16-19:5, 34:2-9, Jul. 5, 2010).

8.     Clear Channel and/or its predecessors have also used, for periods of time during the past thirty years, the names AGRINET OF THE HIGH PLAINS and ALABAMA AGRINET, to identify agricultural radio news networks in the Texas and Alabama areas, respectively.[11]  Helm Decl. ¶ 4 & Exs. M (Hays Dep. 68:9-69:19, 95:10-24, May 17, 2010), R (Storey Dep. 20:3-21:11, May 25, 2010) & S (Stubblefield Dep. 6:17-7:2, 10:12-13:4, May 24, 2010).

9.     Over the past several decades, entities other than Plaintiff and Defendants and their predecessors have identified their agricultural radio news networks with still other Agrinet Marks— including FLORIDA AGRINET, GEORGIA AGRINET, and SOUTHEAST AGRINET.  Helm Decl. ¶ 4 & Ex. V (Cooper Dep. 27:23-33:6, June 8, 2010), and ¶ 9 & Ex. OO8 (NAFB Membership Directory,

---

[11] For all of these networks, the associated broadcast regions have been, in part, established by common agricultural interests, and, as a result, a given state network would typically broadcast into neighboring states as well as the "home" state.  *E.g.*, Helm Decl. ¶ 8 & Exs. NN7(AgriMarketing Magazine Marketing Services Guide, 2000) (listing OKLAHOMA AGRINET affiliate radio stations in Arkansas, Kansas, New Mexico, and Oklahoma) & NN8 (AgriMarketing Magazine Marketing Services Guide, 2004) (listing AGRINET OF THE HIGH PLAINS affiliate radio stations in Colorado, New Mexico, Texas, and Oklahoma).

4

1999). Sunstar Telecom, Inc. registered the mark FLORIDA AGRINET with the Florida Secretary of State in 1990. Helm Decl. ¶ 5 & Ex. AA (Florida Trademark Registration No. T12583).

10. Notably, the services claimed in Plaintiff's federal registration of AGRINET do *not* include the services in which Plaintiff is presently primarily engaged. Plaintiff's *sole* source of revenue in connection with its use of the AGRINET mark for the past several years has been as part of an advertising placement service, not in connection with the educational services for which the federal registration was issued. Helm Decl. ¶ 4 & Ex. J (L. Ray Dep. 194:10-13, May 10, 2010). The exclusive rights associated with a federally registered mark extend only to services within the scope of the services described in the registration. 15 U.S.C. § 1057(b).

B. **Plaintiff has admitted its knowledge of Defendants' and others' unlicensed use of Agrinet Marks.**

11. Ever since Clear Channel's predecessors began using OKLAHOMA AGRINET, TENNESSEE AGRINET, and KENTUCKY AGRINET in the late 1970s, Plaintiff has known that Clear Channel and its predecessors use various Agrinet Marks to identify their agricultural radio news networks. *See, e.g.*, Helm Decl. ¶ 4 & Ex. W (W. Ray Dep. 253:20-254:4, June 23, 2010) (relating that "intruders" began using OKLAHOMA AGRINET, TENNESSEE AGRINET, and KENTUCKY AGRINET "in the late '70s or early '80s").

12. In deposition testimony, Plaintiff acknowledged that the National Association of Farm Broadcasters ("NAFB") Membership Directory reflects use of Agrinet Marks by other entities since 1978. Helm Decl. ¶ 4 & Ex. W (W. Ray Dep., 249:13-22, 310:7-9, June 23, 2010); *see also* Helm Decl. ¶ 9 & Ex. OO1 (NAFB Membership Directory, 1978), and ¶ 8 & Ex. NN1 (Agrimarketing Magazine Marketing Services Guide, 1978). Indeed, Plaintiff's principal has consistently been an active member of the NAFB (which requires its members to attend annual meetings of the organization) and virtually all of Defendants' and third parties' use of the Agrinet Marks is well documented in the NAFB's historical membership directories. *See, e.g.*, Helm Decl. ¶ 8 & Exs. OO1-OO9 (excerpts from NAFB Membership Directories from 1978, 1982, 1985, 1986, 1989, 1991, 1997, and 2002) (showing use of AGRINET OF

5

THE HIGH PLAINS, ALABAMA AGRINET, FLORIDA AGRINET, GEORGIA AGRINET, GEORGIA/FLORIDA AGRINET, INDEPENDENT FLORIDA AGRINET, KENTUCKY AGRINET, OKLAHOMA AGRINET, SOUTHEAST AGRINET, and TENNESSEE AGRINET during the past thirty years) & ¶ 10 (NAFB Membership Directory, 1993) (including KENTUCKY AGRINET, OKLAHOMA AGRINET, SOUTHEAST AGRINET, and TENNESSEE AGRINET); *see also* Helm Decl. ¶ 4 & Ex. M (Hays Dep. 81:4-82:20, May 17, 2010) (usefulness of NAFB membership directories).

13.     Such historical use is also well documented in an annual directory prepared and published by AgriMarketing magazine for use by agricultural marketers, who represent the economic lifeblood of the agricultural broadcasting industry.  *See* Helm Decl. ¶ 8 & Exs. NN1-NN9 (excerpts from AgriMarketing Magazine Annual Marketing Services Guide from 1978, 1979, 1982, 1987, 1989, 1997, 2000, 2004, and 2009) (evidencing use of  AGRINET OF THE HIGH PLAINS, ALABAMA AGRINET, FLORIDA AGRINET, GEORGIA AGRINET, GEORGIA/FLORIDA AGRINET, INDEPENDENT FLORIDA AGRINET, KENTUCKY AGRINET, OKLAHOMA AGRINET, and TENNESSEE AGRINET over the past thirty years), and ¶4 & Ex. M (Hays Dep. 82:21-25, May 17, 2010) (usefulness of AgriMarketing magazine directory).

14.     More specifically, Plaintiff's principal and designated Rule 30(b)(6) corporate representative has admitted Plaintiff's knowledge of Clear Channel's and its predecessors' use of Agrinet Marks since approximately 1978, as illustrated in the following table.

| Agrinet Mark(s) Used by Clear Channel or Its Predecessor(s) | Year Such Use Was Admittedly Known to Plaintiff | Deposition Testimony & Discovery Responses |
| --- | --- | --- |
| OKLAHOMA AGRINET | "in or about" 1978 | Helm Decl. ¶ 2 & Ex. D (Pl.'s Resps. to Def. Clear Channel Broad., Inc.'s 2d Set of Interrogs.) at 6. |
| OKLAHOMA AGRINET and TENNESSEE AGRINET | 1982 | Helm Decl. ¶ 4 & Ex. W (W. Ray Dep., 337:19-23, 337:24-338:4, June 23, 2010). |
| OKLAHOMA AGRINET | 1984 | Helm Decl. ¶ 4 & Ex. W (W. Ray Dep., 364:16-365:1, June 23, 2010). |
| TENNESSEE AGRINET and | 1989 | Helm Decl. ¶ 4 & Ex. W (W. Ray Dep., |

6

| KENTUCKY AGRINET | | 366:12-14, 366:21-23, June 23, 2010). |
|---|---|---|
| OKLAHOMA AGRINET, TENNESSEE AGRINET, and KENTUCKY AGRINET | 1991 | Helm Decl. ¶ 4 & Ex. W (W. Ray Dep. 340:3-7, 340:19-341:2, 339:6-8, 338:19-22, June 23, 2010). |
| OKLAHOMA AGRINET and TENNESSEE AGRINET | 1993 | Helm Decl. ¶ 4 & Ex. W (W. Ray Dep. 344:23-345:3, 358:20-359:8, 342:24-343:4, June 23, 2010). |
| OKLAHOMA AGRINET, TENNESSEE AGRINET, and ALABAMA AGRINET | 1997 | Helm Decl. ¶ 4 & Ex. W (W. Ray Dep. 346:14-23, June 23, 2010). |
| OKLAHOMA AGRINET, TENNESSEE AGRINET, and ALABAMA AGRINET | 1998 | Helm Decl. ¶ 4 & Ex. W (W. Ray Dep. 351:16-19, 351:20-352:7, 352:8-10, June 23, 2010). |
| OKLAHOMA AGRINET, TENNESSEE AGRINET, and ALABAMA AGRINET | 1999 | Helm Decl. ¶ 4 & Ex. W (W. Ray Dep. 353:22-24, 353:25-354:5, 354:2-7, June 23, 2010). |
| AGRINET OF THE HIGH PLAINS | "soon after" 1999 | Helm Decl. ¶ 4 & Ex. W (W. Ray Dep. 353:4-13, June 23, 2010). |
| OKLAHOMA AGRINET, TENNESSEE AGRINET, and AGRINET OF THE HIGH PLAINS | 2000 | Helm Decl. ¶ 4 & Ex. W (W. Ray Dep. 357:9-13, 357:2-5, 355:2-9, June 23, 2010). |
| OKLAHOMA AGRINET, TENNESSEE AGRINET, and AGRINET OF THE HIGH PLAINS | 2001 -2002 | Helm Decl. ¶ 4 & Ex. W (W. Ray Dep. 360:11-17, 360:19-361:2, June 23, 2010). |
| OKLAHOMA AGRINET, TENNESSEE AGRINET, and AGRINET OF THE HIGH PLAINS | 2002-2003 | Helm Decl. ¶ 4 & Ex. W (W. Ray Dep. 361:25-362:2, 362:12-14, 361:22-362:2, June 23, 2010). |

15.     Plaintiff has also known that third parties have used other Agrinet Marks, including

FLORIDA AGRINET, GEORGIA AGRINET, GEORGIA/FLORIDA AGRINET, INDEPENDENT

FLORIDA AGRINET, and SOUTHEAST AGRINET, to identify their own agricultural radio news

networks since at least as early as 1982.  Helm Decl. ¶ 4 & Ex. W (W. Ray Dep. 339:9-15, 345:4-9

(admitting knowledge of SOUTHEAST AGRINET in 1991 and 1993), 342:7-15 (admitting knowledge of

FLORIDA AGRINET in 1991), 364:3-6 (admitting knowledge of GEORGIA/FLORIDA AGRINET in

1982), 364:20-23 (admitting knowledge of GEORGIA AGRINET in 1984), 367:11-19 (admitting

knowledge of INDEPENDENT FLORIDA AGRINET in 1989), June 23, 2010).

**C.** **Plaintiff and its predecessor permitted Defendants and others to use various Agrinet Marks without asserting rights in Plaintiff's AGRINET registration.**

16.     Although the manner and extent of the decades of use of OKLAHOMA AGRINET and TENNESSEE AGRINET by Clear Channel and its predecessors were known to Plaintiff and its predecessor, Plaintiff did not assert any rights in the AGRINET mark with respect to such use until late 2006.  In fact, individuals associated with OKLAHOMA AGRINET, TENNESSEE AGRINET, KENTUCKY AGRINET, and FLORIDA AGRINET all testified that Plaintiff failed to obtain any type of agreement or control whatsoever with respect to uses of the Agrinet Marks by entities other than Plaintiff. Helm Decl. ¶4 & Exs. N (Jeldy Dep. 68:17-24, May 18, 2010 (as Ron Hays's supervisor, witness was never contacted by Plaintiff regarding use of OKLAHOMA AGRINET)), P (Parrish Dep. 43:9-44:11, 45:11-25, May 18, 2010 (testifying that there was never any follow up to Plaintiff's predecessor's letter offering a license to use AGRINET in Oklahoma, that no agreement was ever reached, and that Clear Channel's predecessor filed application for Oklahoma state service mark registration of OKLAHOMA AGRINET in 1978)), R (Storey Dep. 73:5-11, May 25, 2010 (indicating that no agreement was ever reached with Plaintiff regarding use of TENNESSEE AGRINET), S (Stubblefield Dep. 78:9-79:12, 80:12-17, 84:10-14, May 24, 2010 (describing isolated discussion with Bill Ray concerning use of KENTUCKY AGRINET, but stating that witness did not agree to anything and never received any other communication from Bill Ray regarding the use of AGRINET until the present litigation)), V (Cooper Dep. 128:21-132:13, 181:18-183:7, June 8, 2010 (discussing correspondence between witness and Plaintiff or its attorneys regarding use of FLORIDA AGRINET or INDEPENDENT FLORIDA AGRINET and Plaintiff's failure to seek to enforce any rights in the AGRINET mark)), Q (Dain Dep. 37:22-38:20 (relating 2006 conversation with Bill Ray regarding use of OKLAHOMA AGRINET and indicating that "it didn't ever go anywhere"), 44:21-45:8 (witness never heard from Bill Ray or anyone associated with Plaintiff after initial conversation in 2006), May 19, 2010).

17.     Plaintiff's own testimony also substantiates that Plaintiff "did not object" to Defendants' and other third parties' uses of the Agrinet Marks.  Helm Decl. ¶ 4 & Ex. W (W. Ray Dep. 170:5-172:10

8

(Plaintiff's predecessor did not object to Clear Channel's predecessor's use of OKLAHOMA AGRINET, despite the fact that no agreement was reached), 172:21-174:2 (Plaintiff decided not to object when Clear Channel began using AGRINET OF THE HIGH PLAINS, and no agreement was in place), 176:7-19 (although users of FLORIDA AGRINET and INDEPENDENT FLORIDA AGRINET were not licensed, Plaintiff did not institute legal proceedings), June 3, 2010).

18.    In fact, the only instance when Clear Channel or its predecessors ceased use of an Agrinet Mark to identify an agricultural radio news network in connection with any contact or communication with Plaintiff was with respect to KENTUCKY AGRINET, which Jack Crowner testified he requested be changed to KENTUCKY AG-NET as a personal favor to Bill Ray. Helm Decl. ¶ 4 & Ex. X (Crowner Dep. 43:17-44:18, Jul. 5, 2010). Mr. Crowner specifically testified that the change was not made because of any legal obligation to do so.[12]  *Id.*

**D.    Defendants' and third parties' uses of the Agrinet Marks were not licensed by Plaintiff or its predecessor.**

19.    Since the beginning of this dispute, Plaintiff has persistently and deliberately refused to articulate its case. *See* Mem. of Law in Supp. of Defs.' Mot. for Sanctions for Pl.'s Failure to Provide Dep. Test. Pursuant to Rule 30(b)(6) (Docket No.92); Mem. in Supp. of Defs.' Mot. to Compel Disc. Resps. & Doc. Produc. (Docket No.115). Presumably, this is because Plaintiff simply cannot explain the decades of unlicensed use of the Agrinet Marks by Clear Channel and others. On the central issue of Clear Channel's and its predecessors' decades of use of Agrinet Marks, Plaintiff has sometimes asserted that Clear Channel (and its predecessor) was licensed,[13] sometimes that Clear Channel's (and its

---

[12] Tellingly, Mr. Crowner further testified that, after the name change in or about 1993, he regularly attended meetings with Oklahoma Agrinet broadcasters—and eventually Tennessee Agrinet broadcasters—and there was never any mention of any alleged rights of Plaintiff in the AGRINET mark. Helm Decl. ¶ 4 & Ex. X (Crowner Dep. 49:17-51:10, Jul. 5, 2010).

[13] *E.g.*, Helm Decl. ¶ 3 & Ex. H (Letter from Jeffrey Smith, counsel for Plaintiff, to Pamela Huff, counsel for Defendants (Apr. 16, 2007)).

predecessor's) employee Ron Hays was licensed,[14] and sometimes that Clear Channel's use of Agrinet Marks was not licensed at all.[15]

20.     In actuality, the overwhelming weight of third-party testimony conclusively establishes that no such licenses ever existed with respect to any of the Agrinet Marks used by Defendants or a separate operation in the Southeast United States.  Helm Decl. ¶ 4 & Exs. M (Hays Dep. 195:12-19, 198:10-13, May 17, 2010)  (none for OKLAHOMA AGRINET)), P (Parrish Dep. 45:11-25, May 18, 2010)  (same)), N (Jeldy Dep. 49:23-50:19, May 18, 2010) (same), O(West Dep. 72:7-17, May 18, 2010) (OKLAHOMA AGRINET)), R (Storey Dep. 73:1-74:3, May 25, 2010 (TENNESSEE AGRINET)), V (Cooper Dep. 123:14-25, 127:20-132:9, June 8, 2010) (none for FLORIDA AGRINET and/or other Agrinet Marks)), S (Stubblefield Dep. 80:12-83:22, May 24, 2010) (none for KENTUCKY AGRINET)), X (Crowner Dep. 43:8-44:16, Jul. 5, 2010) (same)).  Indeed, when questioned during his deposition, Bill Ray, Plaintiff's principal and Rule 30(b)(6) corporate representative, admitted that no licenses existed – for the marks used by Defendants and their predecessors, or the marks used by a separate operation in the Southeast United States.  Helm Decl. ¶ 4 & Ex. T (W. Ray Dep. 170:5-174:2 (no agreement with respect to OKLAHOMA AGRINET or AGRINET OF THE HIGH PLAINS), 158:14-160:1 (no agreement with respect to TENNESSEE AGRINET), 176:23-177:3 (no agreement with respect to ALABAMA AGRINET), 142:17-144:17, 151:22-152:11, 153:19-155:6 (no agreement with respect to KENTUCKY AGRINET), 144:18-145:1, 146:19-25 (no agreement with respect to AGRINET OF THE HIGH PLAINS), 176:7-12 (no agreement with respect to FLORIDA AGRINET or INDEPENDENT FLORIDA AGRINET), June 3, 2010).

21.     Documents produced by Plaintiff also indicate that Plaintiff's various "license" theories may have been manufactured for the purposes of this litigation.  Helm Decl. ¶ 6 & Exs. FF at 2

---

[14] *E.g.*, Helm Decl. ¶ 2 & Exs. A  at 1-2, 8 (Pl.'s Resps. to Def. Clear Channel Broad., Inc.'s First Set of Interrogs.), B at 1-2 (Pl.'s Resps. to Def. Clear Channel Commc'ns, Inc's First Set of Interrogs.), C at 1-2 (Pl.'s Resps. to Def. Katz Media Grp., Inc.'s First Set of Interrogs.), D at 2 (Pl.'s Resps. to Def. Clear Channel Broad., Inc.'s 2d Set of Interrogs.), E at 1-2 (Pl.'s Resps. to Def. Clear Chanel Commc'ns, Inc.'s 2d Set of Interrogs.), F at 2 (Pl.'s Resps. to Def. Katz Media Grp., Inc.'s 2d Set of Interrogs.), ¶ 4 & Ex. J (L. Ray Dep. 217:20-219:13 & Ex. 4, May 10, 2010).

[15] *E.g.*, Helm Decl. ¶ 4 & Ex. L (W. Ray Dep. 85:1-18, May 11, 2010).

(November 18, 2005 letter from Lisa Ray to Pam Fretwell, National Association of Farm Broadcasters, stating that "[t]he only exception is years ago, Oklahoma Agrinet was given permission to use the name in Oklahoma," after pointing out Plaintiff's AGRINET trademark registration),[16] HH (Email from Lisa Ray to Joe Jeldy, seeking "any information [Mr. Jeldy] may have" regarding any "licensing arrangement" with respect to OKLAHOMA AGRINET in the 1970s (Sep. 6, 2007)), II (Emails from Lisa Ray and Bill Ray to Rick Parrish requesting what Mr. Parrish recalls "and/or what [he] can gather from [his] files regarding the licensing use, oral and/or written, of the name OKLAHOMA AGRINET" (Oct. 12 & 18, 2007), JJ (Email from Bill Ray to Colin Rosse indicating that Plaintiff is "trying to document" rights in the AGRINET mark (Oct. 25, 2007)).

22.     Even crediting, for a moment, Plaintiff's unsupported licensing theories, neither Plaintiff nor its predecessor ever had or exercised any control over its (sometimes) alleged "licensees'" use of the Agrinet Marks. Helm Decl. ¶ 4 & Exs. M (Hays Dep. 198:14-199:7, May 17, 2010) (none for OKLAHOMA AGRINET), P (Parrish Dep. 46:7-13, May 18, 2010) (same), N (Jeldy Dep. 50:2-24, May 18, 2010) (same), O (West Dep. 72:18-73:23, May 18, 2010) (same), S (Stubblefield Dep. 83:23-84:9, May 24, 2010) (none for KENTUCKY AGRINET), X (Crowner Dep. 45:22-46:24, Jul. 5, 2010) (same); V (Cooper Dep. 195:17-196:11, June 8, 2010) (none for FLORIDA AGRINET and/or other Agrinet Marks).

**E.     Plaintiff's various assertions regarding damages are confused, inconsistent, speculative, and legally insufficient.**

23.     As set forth in the Memorandum of Law in Support of Defendants' Motion for Sanctions for Plaintiff's Failure to Provide Deposition Tesitmony Pursuant to Rule 30(b)(6) (Docket No. 92) and the Memorandum of Law in Support of Defendants' Motion to Compel Discovery Responses and Document Production (Docket No. 115), both of which are hereby incorporate herein by reference, Plaintiff has failed and refused to articulate any cognizable basis for damages in this lawsuit.

---

[16] Even with respect to Oklahoma Agrinet, Mrs. Ray's correspondence does not indicate that any type of license agreement was in place—only that "permission" had been given.

11

24.     On May 3, 2010, after the parties had engaged in an unsuccessful mediation, Plaintiff served its Supplemental Initial Disclosures,[17] setting forth for the first time a discussion of its damages. Even a brief review of that disclosure (served without any documents or reference to documents, contrary to the requirements of Rule 26) reveals that it does not set forth any coherent or intelligible theory of damages. Helm Decl. ¶ 6 & Ex. R (Pl.'s Supp. Initial Discl.). In fact, even the fanciful, wholly speculative assertion in Plaintiff's Supplemental Initial Disclosures of what an (unspecified) network "should" make is contrary to the hollow, conclusory assertion of Plaintiff's designated corporate representative that the numbers disclosed as to what a network "should have" made refer to Plaintiff's own network, not to any network of Defendants (as claimed by Plaintiff's Supplemental Initial Disclosures themselves). Helm Decl. ¶ 4 & Ex. W (W. Ray Dep. 315:19-23, June 23, 2010). Moreover, although Plaintiff's Supplemental Initial Disclosures seem to rely on nothing more than Plaintiff's "expertise or experience," Plaintiff's corporate representative and principal testified that he would have little to no expertise on the calculation of Plaintiff's damages. Helm Decl. ¶ 4 & Ex. W (W. Ray Dep. 308:12-309:10, June 23, 2010).

25.     In deposition testimony, Plaintiff's designated representative could not or would not provide any meaningful information concerning Plaintiff's alleged damages, even though Plaintiff's representative acknowledged that Defendants are entitled to rely on the information provided, and that Defendants cannot be expected to address or be accountable for information or basis for alleged damages not provided by the company. Helm Decl. ¶ 4 & Ex. W (W. Ray Dep. 191:23-193:16, June 23, 2010). [18]

---

[17] Rule 26(a)(1)(A)(iii) requires a computation of each category of damages claimed by the disclosing party to be made in that party's initial disclosures. Fed. R. Civ. P. 26(a)(1)(A)(iii). That rule also requires the disclosing party to make available to the other parties "documents or other evidentiary material . . . on which each computation is based, including materials bearing on the nature and extent of injuries suffered." *Id.*

[18] Consistent with this lack of fundamental information, Bill Ray also could not or would not testify as to how Clear Channel had allegedly interfered with Plaintiff's business. Helm Decl. ¶ 4 & Ex. W (W. Ray Dep. 233:1-11 ("I'm not prepared to answer that."), 233:20-24 ("I am prepared to make statements on behalf of Ray Communications, which is telling you that I'm not prepared to make a statement on [alleged interference] at this time, except to say that these damages are huge and they continue to mount.") June 23, 2010).

12

26.     Although Mr. Ray was designated as Plaintiff's sole corporate representative regarding damages,[19] he repeatedly failed to provide information regarding Plaintiff's damages or any damages theories:

> Q.     So you have no knowledge as to the monetary recovery sought by plaintiff as a remedy for claims asserted by it?
>
> A.     That is correct.

Helm Decl. ¶ 4 & Ex. W (W. Ray Dep. 396:12-15, June 23, 2010); *see also* Helm Decl. ¶ 4 & Ex. W (W. Ray Dep. 321:20, June 23, 2010) (replying "I really don't know" to question regarding damages allegedly caused by Katz Media Group, Inc.).

27.     Moreover, Mr. Ray could not account for the discrepancies between Plaintiff's damages theories and the established facts of the case, sometimes referring Defendants' counsel instead to Lisa Ray and Plaintiff's counsel, neither of whom were designated by Plaintiff to testify as to damages.  Helm Decl. ¶ 4 & Ex. W (W. Ray Dep. 309:11-310:16 (indicating that witness is unable to explain why damages in Plaintiff's Supplemental Initial Disclosures were calculated from 2006-2009 when Clear Channel and its predecessors had used AGRINET marks since the 1970s), 392:3-393:15 (witness unable to explain how the 2002-2005 figures presented in Plaintiff's Response to Defendant Clear Channel Communications, Inc.'s Interrogatory No. 18 concerning damages relate to Ron Hays's departure from Clear Channel in 2006), June 23, 2010).  In fact, Mr. Ray repeatedly referred Defendants' counsel to Mrs. Ray[20] and Plaintiff's counsel for any or all information regarding Plaintiff's damages or the calculations and methods used to arrive at Plaintiff's various damages figures.  *See, e.g.*, Helm Decl. ¶ 4 & Ex. W (W. Ray Dep. 310-12 and 318-22, June 23, 2010).

---

[19] At Lisa Ray's May 10, 2010 deposition, Plaintiff's counsel interrupted questioning tangentially related to damages to interject that "She wasn't designated for damages."  Helm Decl. ¶ 4 & Ex. J (L. Ray Dep. 195:18-19, May 10, 2010).

[20] Again, as explained above, at the deposition of Lisa Ray during the Arlington Depositions, Plaintiff's counsel interrupted Defendant's counsel during questions concerning damages, saying that she was not the designee on that topic.  Moreover, when Plaintiff's counsel requested the right to re-designate Lisa Ray for the Charlottesville Deposition, Defendants agreed – Plaintiff's counsel, however, elected not to re-designate her.

28.     Significantly, Mr. Ray, as Plaintiff's Rule 30(b)(6) designee on the topic of damages, even indicated that Plaintiff (at least its ad placement service, which is apparently its only source of revenue in recent years) has, in significant part, been helped – not damaged – by the alleged infringement by Defendants:

> A.     . . . I mean, it's easier for us to attract stations now than it has been.  I think – I think the situation may help it some, the situation we're in – your client and we're involved in right now.  I think it helps us.
>
> Q.     How is it that it helps you?
>
> A.     I don't know.  If I knew that I'd – I'd bottle it up and sell it.
>
> Q.     So you think this dispute has actually given favorable attention to the Agrinet ad placement services?
>
> A.     I think it has.  I think it has.  We're hearing from a lot of people just – I'm just going to volunteer this and my mouthpiece here doesn't like me to do that, but we're just having more – more people come to us; yes.

Helm Decl. ¶ 4 & Ex. W (W. Ray Dep. 377:6-23, June 23, 2010); *see also* Helm Decl. ¶ 4 & Ex. W (W. Ray Dep. 373:25-374:8 (testifying that Plaintiff is not having any problems achieving its goal of attracting stronger, bigger stations and that "[w]e are really not having to do anything right now. They are pretty much calling us"), 373:25-376:23 (testifying that "it's getting easier" to attract stations and meet their objective of expanding advertising representation nationally), 379:12-380:4 (testifying that Plaintiff has not met any particular difficulties in trying to extend into Oklahoma or Tennessee because of the OKLAHOMA AGRINET or the TENNESSEE AGRINET, either before or after Ron Hays left Clear Channel), 250:22-251:6 (testifying that use of TENNESSEE AGRINET and OKLAHOMA AGRINET would not cause more confusion today than it would have 10 or 15 years ago), June 23, 2010).

29.     As mentioned, Lisa Ray testified that Plaintiff's ad placement service has been Plaintiff's "sole" source of revenue from 2006 through the date of the deposition.  *See, e.g.*, Helm Decl. ¶ 4 & Ex. J (L. Ray Dep., 194:10-14, May 10, 2010).  Thus, any lost advertising clients in the past few years would

14

be in connection with Plaintiff's advertisement placement services, which are not covered by Plaintiff's federal registration for use of the AGRINET mark.[21]

30.     Moreover, the monetary figures and damage calculations that Plaintiff presented in an interrogatory response (which, again, Plaintiff's designated corporate representative could not explain) are astoundingly arbitrary and are not articulated in a manner that could even imaginably form the basis of any calculation of damages. In that response, it seems that Plaintiff arbitrarily selected two "good" years (for which it may or may not be claiming damages), averaged its revenue for those years, then subtracted the average of three arbitrarily chosen "bad" years (for which it may or may not be claiming damages). [cite response – using reference to already-filed under seal ] Plaintiff then appears to contend that Defendants should be responsible for the entirety of that difference for approximately four completely different years (*i.e.*, four years that are not even included in the range of years between the "good" years and the "bad" years picked by Plaintiff).  Plaintiff apparently attempts to justify this arbitrary approach by pronouncing that there were other factors in more recent years which make a calculation of Plaintiff's recent losses inapplicable.[22]  Moreover, Plaintiff provides no support (or meaningful responses to other discovery requests that seek information that would bear on damages) for this incredible position, nor does Plaintiff explain away the very real possibility that, just as with respect to the 2006-2009 time period, other factors contributed to the loss of revenue between the "good" and "bad" years for which Plaintiff apparently and arbitrarily wishes to wholly blame Defendants.  *See, e.g.* Helm Decl. ¶ 4 & Ex. W (W. Ray Dep. 333:14-21, June 23, 2010).

### III.     ARGUMENT & AUTHORITIES

31.     Summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A fact is "material" only if its resolution in favor of one party might affect the outcome of the suit under governing law.  *Anderson v.*

---

[21] Plaintiff's federal AGRINET registration is for "educational services rendered through the medium of radio; namely, a program of interest to farmers." Helm Decl. ¶ 5 & Ex. Y (AGRINET registration).

[22] Plaintiff evidently concedes that other factors having nothing to do with Defendants were responsible for any revenue declines during the 2006-2009 period of time.

15

*Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* An issue is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the non-moving party. *Id.* If the evidence rebutting the motion for summary judgment is only colorable or not significantly probative, summary judgment should be granted. *Id.* at 249-50; *see Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 213 (4th Cir. 2007).

32.      Once the moving party has "inform[ed] the district court of the basis for its motion, and identif[ied] those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact," the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986) (quoting Fed. R. Civ. P. 56(e)). To sustain this burden the non-moving party must produce evidence admissible at trial. *See Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993). A party is entitled to summary judgment if "the record as a whole could not lead a rational trier of fact to find for the non-movant." *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991).

   **A.      Defendants are entitled to summary judgment on the affirmative defenses of laches and/or acquiescence.**

33.      Summary judgment may properly be granted as to all grounds of relief—including both equitable and monetary claims—on the basis of the affirmative defenses of laches and/or acquiescence. *Skippy, Inc. v. CPC Int'l, Inc.*, 674 F.2d 209, 212 (4th Cir. 1982); *Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1041 (2d Cir. 1980); *Audi AG & Volkswagen of Am., Inc. v.Shokan Coachworks, Inc.*, 592 F. Supp. 2d 246, 268 (N.D.N.Y. 2008).

   **1.      Laches**

34.      Courts will decline to enforce trademarks (and to award damages) where laches can be established. "Estoppel by laches generally applies in a trademark infringement action to preclude relief for an owner of a mark who has unreasonably slept on his rights." *What-a-burger of VA, Inc. v.*

16

*Whataburger, Inc.*, 357 F.3d 441, 448 (4th Cir. 2004). Laches will bar recovery where: (a) the registrant knew of the alleged infringing use; (b) the registrant unreasonably and inexcusably delayed in seeking a remedy for such infringement; and (c) the allegedly infringing user would be unduly prejudiced by such delay. *Whataburger*, 357 F.3d at 449. If these factors are satisfied, "laches will normally bar a trademark owner's claim for damages against an infringer." *Brittingham v. Jenkins*, 914 F.2d 447, 456 (4th Cir. 1990).

<blockquote>

**a.     *Plaintiff knew of Clear Channel's and its predecessors' allegedly infringing use of various Agrinet Marks.***

</blockquote>

35.     As set forth above, it has been conclusively established that Plaintiff actually knew of Clear Channel's and its predecessors' use of Agrinet Marks over the past several decades.[23] Knowledge, in the laches context, means the trademark owner knew or should have known that he or she had a provable claim of infringement. *Whataburger*, 357 F.3d at 449 (4th Cir. 2004) (holding that "[t]o the extent that a plaintiff's prior knowledge may give rise to the defense of estoppel by laches, such knowledge must be of a pre-existing *infringing* use of the mark"). Letters from the plaintiff demanding that use of the mark cease may serve as proof of plaintiff's knowledge at that time. *Schafer Co. v. Innco Mgmt. Co.*, 797 F. Supp. 477, 480 (E.D.N.C. 1992) (stating that "plaintiff's letters to defendant in 1983 and 1988 demanding that the defendants cease using the [subject mark] description on its billboards establish[ed] that plaintiffs knew that defendant was using what plaintiffs considered their mark."). In addition to Plaintiff's clear testimony that it was aware of Defendants' use of OKLAHOMA AGRINET, TENNESSEE AGRINET, AGRINET OF THE HIGH PLAINS, KENTUCKY AGRINET, and ALABAMA AGRINET long before the instant suit was filed, Plaintiff has also produced a cease and desist letter sent to Clear Channel's predecessor regarding use of OKLAHOMA AGRINET in 1978. *See*

---

[23] Contrary to Plaintiff's other positions, Bill Ray admitted that he knew about use of AGRINET OF THE HIGH PLAINS soon after his close acquaintance and (sometimes) alleged individual licensee Ron Hays initiated the use of the mark while working for Clear Channel in or about 1999. Helm Decl. ¶ 4 & Ex. W (W. Ray Dep. 353:7-21, June 23, 2010). Furthermore, Bill Ray testified that he chose not to object, and instead permitted such unlicensed use of AGRINET OF THE HIGH PLAINS. Helm Decl. ¶ 4 & Ex. T (W. Ray Dep. 172:21-173:11, June 3, 2010). Clear Channel ceased using AGRINET OF THE HIGH PLAINS shortly after Ron Hays's departure, and it is unclear on what basis Plaintiff actually contends that such use was ever wrongful.

Helm Decl. ¶ 6 & Ex. CC (correspondence between R. Parrish, General Manager of Clear Channel's predecessor, and Laurence Richardson, President of Charlottesville Broadcasting, regarding Clear Channel's predecessor's use of Oklahoma Agrinet[24]).  Plaintiff claims it sent other letter regarding use of the Agrinet Marks to various individuals associated with Clear Channel and/or its predecessors, and others, in the 1980's.  *See* Helm Decl. ¶ 6 & Ex. EE (August 13, 1986 "template" of letter that Plaintiff claims it sent to employees of Clear Channel or its predecessors regarding use of Oklahoma Agrinet, Tennessee Agrinet, and Kentucky Agrinet).  In light of this uncontroverted evidence (and the other, conclusive evidence of Plaintiff's admitted knowledge set forth above), no genuine issue of material fact exists with respect to Plaintiff's knowledge of Defendants' use of the Agrinet Marks for purposes of the laches defense.

36.     Although Plaintiff has not set forth the details of its case, Plaintiff presumably would assert that action was not taken during the three decades preceeding the filing of this action because Clear Channel's and its predecessors' uses of the Agrinet Marks were not "infringing" by virtue of license agreements entered into between Plaintiff and employees of Clear Channel and its predecessors to use the subject marks.  Helm Decl. ¶ 2 & Ex. A at 3, 5, 7 and 11 (Pl.'s Resp. to Def. CCB's First Set of Interrogs.).  However, no such licenses existed, as reflected by the deposition testimony of the individuals to whom Plaintiff claims it granted such licenses.  *See* Part II.D.20, *supra*, ¶ 17.  Moreover, Plaintiff's Rule 30(b)(6) corporate representative with respect to such license agreements has testified that no such license agreements were actually entered into.  *See* Part II.D.20, *supra*, ¶ 17.

37.     Plaintiff's other inconsistent theories are also unavailing.  For example, after filing suit, Plaintiff (for the most part) no longer asserted that *Clear Channel* was "licensed" to use any of the Agrinet Marks, and instead adopted a theory that various Clear Channel *employees* were so "licensed." Helm Decl. ¶¶ 2 & Exs. A  at 1-2, 8 (Pl.'s Resps. to Def. Clear Channel Broad., Inc.'s First Set of

---

[24] Although Mr. Richardson's initial January 4, 1978 letter to Mr. Parrish has not been produced by Plaintiff or otherwise located, it is clear from Mr. Parrish's response that the initial letter concerned the potential for confusion between Clear Channel's predecessor's use of OKLAHOMA AGRINET and Plaintiff's predecessor's use of AGRINET.

Interrogs.), B at 1-2 (Pl.'s Resps. to Def. Clear Channel Commc'ns, Inc's First Set of Interrogs.), C at 1-2 (Pl.'s Resps. to Def. Katz Media Grp., Inc.'s First Set of Interrogs.), D at 2 (Pl.'s Resps. to Def. Clear Channel Broad., Inc.'s 2d Set of Interrogs.), E at 1-2 (Pl.'s Resps. to Def. Clear Chanel Commc'ns, Inc.'s 2d Set of Interrogs.), F at 2 (Pl.'s Resps. to Def. Katz Media Grp., Inc.'s 2d Set of Interrogs.). Not only is that position is inconsistent with the testimony of the alleged "licensees" themselves, as set forth above, but it ignores the fact that Clear Channel and its predecessors, as owners of the subject networks, have been the actual users of the Agrinet Marks at issue. Plaintiff must agree, given that it has now sued Clear Channel, rather than any individuals, for such use.

38.     In any event, the individual "licensee" theory is also inconsistent because (a) a number of different broadcasters—not just the alleged individual "licensees"—worked for the networks using the Agrinet Marks, Helm Decl. ¶ 4 & Ex. W (W. Ray Dep. 340:22-341:2, 345:24-346:10, 346:24-347:6, 352:11-20, 355:2-18, 360:18-361:2, 361:25-362:14, Jun. 23, 2010), (b) TENNESSEE AGRINET and KENTUCKY AGRINET were used by the relevant networks both before and after the individual "licensees" were actually employed by Clear Channel or its predecessors, Helm Decl. ¶ 4 & Exs. S (Stubblefield Dep. 11:22-12:20, May 24, 2010), and X (Crowner Dep. 40:18-41:16, Jul. 5, 2010), and (c) Ron Hays, who was allegedly "licensed" only to use OKLAHOMA AGRINET, was involved in use of AGRINET OF THE HIGH PLAINS, AGRINET, TENNESSEE AGRINET, and other Agrinet Marks, Helm Decl. ¶ 4 & Ex. M (Hays Dep. 56:25-60:25, 69:9-79:19, 120:22-122:3, May 17, 2010).

39.     Accordingly, there can be no genuine issue of material fact with respect to Plaintiff's knowledge of Defendants' preexisting uses of the Agrinet Marks.

        **b.     *Plaintiff inexcusably and unreasonably delayed in bringing its claims of trademark infringement.***

40.     Delay is measured from the time at which the owner knew of an infringing use *sufficient to require legal action*, and "legal action is not required until there is a real likelihood of confusion." *Whataburger*, 357 F.3d at 451 (4th Cir. 2004). The Fourth Circuit Court of Appeals has held a delay was unreasonable and inexcusable because the trademark counterclaimant had constructive knowledge of the

19

plaintiff's infringing use in 1975, actual knowledge of the infringing use in 1976 (as evidenced by a letter from counterclaimant's attorney to the plaintiff), and knowledge of the defendant's federal registration of the mark in 1978, but did not legally contest the use of the mark until 1983. *Brittingham*, 914 F.2d at 457. In the present case, Plaintiff's delay far exceeds anything that could possibly be considered reasonable. As detailed in Part II.C, *supra*, Plaintiff has allowed Clear Channel and its predecessors to openly use the Agrinet Marks for more than thirty years without objection.

41. Notably, Plaintiff cannot allege that it has somehow expanded its operations such that a likelihood of confusion has arisen only recently (even if such a theory is available under the applicable law). As set forth above, Plaintiff's sole revenues for the past several years have been derived from an advertising placement service that is outside the services covered by Plaintiff's AGRINET registration.[25] In any event, although Plaintiff has failed to answer related written discovery requests, it is clear that Plaintiff had cross-affiliate arrangements with national networks and had its own direct affiliates in Oklahoma, Tennessee, and Texas (and a host of other states) for decades. Helm Decl. ¶ 4 & Ex. K (L. Ray Dep. 343-48, May 11, 2010).

42. Moreover, Bill Ray, as a corporate representative of Plaintiff, testified that Plaintiff believes it has been injured by "intruders" (i.e., all other users of AGRINET marks) going back to the late 1970s and early 1980s. Helm Decl. ¶ 4 & Ex. W (W. Ray Dep. 253:20-254:4, June 23, 2010); *see also* Helm Decl. ¶ 4 & Ex. L (W. Ray Dep. 85:19-87:8, , May 11, 2010) (alleging that all use by Clear Channel since 1984 was infringing), ¶ 4 & Ex. W (W. Ray Dep. 247:21-248:22, 250:22-251:6, 252:13-253:7, June 23, 2010) (testifying that there would be no more confusion today regarding the use of OKLAHOMA AGRINET, TENNESSEE AGRINET, or AGRINET OF THE HIGH PLAINS than in past

---

[25] This distinction is abundantly clear with respect to a dispute in or about 2005 between Gary Cooper (sometimes alleged by Plaintiff to have been one of the individual "licensees" of an Agrinet Mark) and Plaintiff, which was aired before the National Association of Farm Broadcasters. In documents recently produced by Plaintiff, Bill Ray stated that, as a potential resolution of that dispute, Plaintiff would make it clear that its AGRINET-branded advertising placement service would be distinguished in its marketing materials from Plaintiff's AGRINET-branded broadcasting services and Plaintiff's membership in that broadcasting trade association. Helm Decl. ¶ 6 & Ex. GG (Letter from Bill Ray to Pam Fretwell, National Association of Farm Broadcasters (Dec. 24, 2005)) & ¶ 4 & Ex. W (W. Ray Dep. 381:14-383:20, June 23, 2010).

3087332.3

decades). Bill Ray further testified that, if anything, Plaintiff's potential business expansion would be in the area of cattle ranching, which, like Plaintiff's advertising placement service, is not covered by Plaintiff's AGRINET registration. Helm Decl. ¶ 4 & Ex. W (W. Ray Dep. 407:23-408:8, June 23, 2010).

> **c.      Defendants are unduly prejudiced by Plaintiff's delay in enforcing its alleged trademark rights.**

43.      In the trademark infringement context "prejudice refers to reliance on the trademark holder's inaction which permits the defendant to build up a valuable business around the trademark." *Schafer Co.*, 797 F. Supp. at 480. As stated by Professor McCarthy, "[l]aches is a good defense if plaintiff's long delay has caused defendant to rely to his detriment by building up a valuable business around its trademark." 6 J. Thomas McCarthy, McCarthy on Trademarks § 31:12 (1997); *see Grupo Gigante SA De CV v. Dallo & Co.*, 391 F.3d 1088, 1105 (9th Cir. 2004) (explaining that a defendant may demonstrate prejudice by showing that it "continued to build a valuable business around its trademark during the time that plaintiff delayed in exercising its legal rights").

44.      In the present case, Plaintiff has stood by while Defendants and their predecessors have built a valuable business around the Agrinet Marks, establishing their reputation under those marks in the agricultural radio broadcasting industry, in relevant trade groups such as the NAFB, and with the listening public. Plaintiff did not object to such use for more than three decades, only now to sue Defendants, seeking to obtain a wholly unwarranted monetary windfall and to benefit from Clear Channel's and its predecessors' long-term investment in the Agrinet Marks. Moreover, Ron Hays now works for Clear Channel's competitor in Oklahoma, and it would be manifestly unfair and improper to require Clear Channel to stop using OKLAHOMA AGRINET without at least some assurance that its competitor would not simply start using it. *See* Helm Decl. ¶ 4 & Ex. X (Crowner Dep. 103:1-23, Jul. 5, 2010) (testifying that witness would not want a competitor to adopt the same name he had been using for thirty-five years).

45.      Further, Defendants have suffered significant evidentiary prejudice as a result of the Plaintiff's long delay. The desire to avoid such prejudice has been expressed as follows:

> Plaintiffs are encouraged to file suits when courts are in the best position
> to resolve disputes. As claims become increasingly stale, pertinent
> evidence becomes lost, equitable boundaries blur as defendants invest
> capital and labor into their claimed property, and plaintiffs gain the
> unfair advantage of hindsight, while defendants suffer the disadvantage
> of uncertain future outcome.

*NAACP v. NAACP Legal Defense Fund*, 753 F.2d 131, 137 (D.C. Cir. 1985). Plaintiff has sought to take advantage of this situation, claiming that:

- Plaintiff "purged" letters allegedly sent in 1986 that are supposedly Plaintiff's primary evidence of the (sometimes) alleged "licenses" (Helm Decl. ¶ 4 & Ex. K (L. Ray Dep. 487:13-488:13, May 11, 2010));

- Plaintiff suffered a theft in which files reflecting evidence that might have been vital to this case were allegedly stolen (Helm Decl. ¶ 4 & Ex. W (W. Ray Dep., 271:14-272:11, 326:17-20, June 23, 2010));

- Plaintiff suffered a computer crash in late 2008, and the files on the computer were not recoverable (Helm Decl. ¶ 2 & Ex. B at 5 (Pl.'s Resps. to Def. Clear Channel Comm'ns, Inc.'s 2d Set of Interrogs.)); and

- there is an ongoing conspiracy that has corrupted files, interfered with Plaintiff's operations, and caused all or virtually all of the decline in business suffered by Plaintiff for the past several years (Helm Decl. ¶ 4 & Ex. W (W. Ray Dep. 267:19-270:25, June 23, 2010); Pl.'s Resps. to Def. Clear Channel Commc'ns, Inc.'s 3d Set of Interrogs. at 5-6 (submitted previously as a proposed sealed document (Docs. 93 & 116) to be filed as Ex. N to Mem. of Law in Supp. of Defs.' Mot. for Sanctions for Pl.'s Failure to Provide Dep. Test. Pursuant to Rule 30(b)(6) (Docket No. 92) and as Ex. M to Decl. of Marissa Helm in Supp. of Defs.' Mot. to Compel Interrog. Resps. & Doc. Production (Docket No.115)).

46. Needless to say, the equities weigh heavily against punishing Defendants for decades-stale claims that Plaintiff apparently contends are supported by evidence that—based on a host of excuses, none of which are related to Defendants—is no longer available.

### 2. Acquiescence

47. Acquiescence, the active counterpart to laches, is applicable where it can be demonstrated that: (a) there was a preexisting infringing use; (b) the registrant made an active representation that the registrant would not assert a right; (c) the registrant has unreasonably delayed in seeking redress; and (d) the allegedly infringing user would be unduly prejudiced by such delay. *What-a-Burger of VA v. Whataburger, Inc.*, 357 F.3d 441, 452 (4th Cir. 2004); *Sweetheart Plastics, Inc. v. Detroit Forming, Inc.*, 743 F.2d 1039, 1046 (4th Cir. 1984).

22

**Three of the four elements of acquiescence have been established above with respect to laches.**

48.     Three of the elements of the acquiescence defense—preexisting infringing use, unreasonable delay, and undue prejudice—are identical to the elements of laches, which have been conclusively established and addressed above.

b.     **Plaintiff actively represented that it would not assert a right in the AGRINET mark.**

49.     Plaintiff has over the past several decades provided assurances to various representatives of Clear Channel and its predecessors that no rights would be asserted against them in connection with their use of the Agrinet Marks.  Helm Decl. ¶ 4 & Ex. W (W. Ray Dep. 143:8-143:19, 152:25-153:12, 153:25-154:16, 158:14-160:1, June 23, 2010).  In fact, as Bill Ray repeatedly testified, this is the most that Plaintiff or its predecessor ever did with respect to others' use of Agrinet Marks.  *E.g.* Helm Decl. ¶ 4 & Exs. T (W. Ray Dep. 143:8-19, 151:22-152:19, Jun. 3, 2010) (testifying that permission was granted with respect to KENTUCKY AGRINET) & L (W. Ray Dep. 72-74, & 83, May 11, 2010) (testifying that Plaintiff gave or would have given permission to Ron Hays, Krit Stubblefield, Jack Crowner, Mike Miller, et al. to use various Agrinet Marks).  Plaintiff's attempts (at least in its interrogatory responses, presumably prepared by its attorney, but sworn to by Bill and/or Lisa Ray) to characterize such conversations as the grant of "licenses" is in stark contrast to the facts, which, as discussed above, conclusively demonstrate that no licensing agreements were ever actually reached.

50.     A trademark owner may acquiesce where its conduct over a period of time evidences an intent not to sue in connection with a defendant's use of the mark.  *Ambrosia Chocolate Co. v. Ambrosia Cake Bakery, Inc.*, 165 F.2d 693, 695 (4th Cir. 1947) (holding that a plaintiff had acquiesced to a defendant's use of the plaintiff's mark during an eight-year delay in asserting its rights, in part, through a letter stating that the plaintiff's interest in the defendant had been heightened due to the defendant's use of the mark).  Such is the case here.

3. **Katz's alleged use of the Agrinet Marks is excused by the application of laches and acquiescence to Plaintiff's claims against Clear Channel.**

51. Because Clear Channel's use of Agrinet Marks is permitted pursuant to the equitable defenses of laches and acquiescence, Katz's advertising sales and marketing of Clear Channel's radio networks under those Agrinet Marks is also permitted. Katz merely identifies the Clear Channel networks it represents by the names Clear Channel provides and is permitted to use. There is no legal basis for asserting that Katz cannot refer to its client's agricultural radio news network by the name it rightfully uses to identify itself.[26] *See,* 15 U.S.C. §§ 1114(1)(a) & (b) (requiring use of federally registered mark to be "likely to cause confusion, or to cause mistake, or to deceive" in order for use to be infringing); 1125(a)(1)(A) (requiring use of mark to be "likely to cause confusion, or to cause mistake, or to deceive" as to the affiliation, connection, association, origin, sponsorship or approval of services in order for use to be infringing), and 1125(a)(1)(B) (requiring use of mark to "misrepresent[] the nature, characteristics, qualities or geographic origin" of the services in order for use to be infringing).

## B. Defendants Are Entitled to Summary Judgment on the Affirmative Defense of Abandonment.

52. Summary judgment may also be granted on the basis of a trademark holder's abandonment of the mark. *Barcamerica, Int'l USA Trust v. Tyfield Imps., Inc.*, 289 F.3d 589, 597 (9th Cir. 2002). It is a fundamental tenet of trademark law that a trademark owner must appropriately protect its rights in a mark, or those rights will be lost through abandonment. 15 U.S.C. § 1127(b); *Defiance Button Mach. Co. v. CBC Metal Prods. Corp.*, 759 F.2d 1053, 1059-61 (2d Cir. 1985); *Sheila's Shine Prods., Inc. v. Sheila Shine, Inc.*, 486 F.2d 114, 124-26 (5th Cir. 1973). Abandonment occurs when a

---

[26] Although AgriMarketing Magazine listed Katz as representing "Kentucky Agrinet" for several years beginning in 2002, Clear Channel's agricultural network in Kentucky has not been known by that name since in or about 1993. Helm Decl. ¶ 4 & Ex. X (Crowner Dep. 19, Jul. 5, 2010). The AgriMarketing Magazine listing appears to be the only instance in which Katz arguably referred to Clear Channel's agricultural network in Kentucky by that name. Helm Decl. ¶ 4 & Ex. I (McGill Dep. 85:19-86:6, Feb. 23, 2010) (testifying that advertisers do not pay attention to or care what the name of a given network is). In any event, Plaintiff waited approximately six years before bringing what appears to be an erroneous listing to Defendants' attention, such delay could constitute laches in its own right, and there could be no real damage as a result of such an isolated listing. *See, e.g.*, Helm Decl. ¶ 4 & Ex. X (Crowner Dep. 37:23-39:7, Jul. 5, 2010). Moreover, it is unclear whether Plaintiff is seeking any relief with respect to Defendants' use of KENTUCKY AGRINET. Helm Decl. ¶ 2 & Ex. G (Pl.'s Supp. Initial Disclosures).

trademark owner, "by any act of commission or omission, causes the mark to lose its significance as an indication of origin." 3 J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition § 17:5, at 17-9 (2008) (hereinafter, "McCarthy"). Acts of abandonment include "nakedly" licensing the mark by failing to exercise sufficient quality control over the licensed use of a mark, such that the mark ceases to function as a "symbol of quality and controlled origin," *Stanfield v. Osborne Indus. Inc.*, 52 F.3d 867, 871 (10th Cir.), *cert. denied*, 516 U.S. 920 (1995), and permitting such excessive adverse use that the mark loses "all significance as an indication of origin," *Sweetheart Plastics*, 743 F.2d at 1048. *See generally* McCarthy §§ 17:6 at 17-9 to 17-10, 18:48 at 18-101 to 18-104; 1 Anne Gilson Lalonde, Gilson on Trademarks § 3.05[9][a] at 3-180 (2008).

53. A trademark owner has an absolute duty to control quality when it licenses a trademark. McCarthy § 18:48 at 18-101. "Naked (or uncontrolled) licensing occurs when a licensor allows a licensee to use the mark on any quality or type of good [or service] the licensee chooses." *Stanfield*, 52 F.3d at 871.

54. Plaintiff, as discussed above, sometimes claims to have "licensed" a variety of individuals to use various Agrinet Marks. In actuality, such claims cannot be anything more than "naked licenses" because it is uncontroverted and conclusively established that Plaintiff has never had nor exercised *any* control whatsoever over any of these alleged employee "licensees," much less the networks that were the actual users of the marks. Each of the pertinent fact witnesses testified unequivocally that Plaintiff never had nor exercised any control with respect to the use of any Agrinet Mark by those individuals and/or the networks by which they were employed. Helm Decl. ¶ 4 & Exs. M (Hays Dep. 198:14-199:7, May 17, 2010) (no control with respect to OKLAHOMA AGRINET, no control with respect to AGRINET OF THE HIGH PLAINS from 1999 to 2006, no control over any other AGRINET from 1984 through 2006), P (Parrish Dep. 46:7-13, May 18, 2010), N (Jeldy Dep. 50:2-24, May 18, 2010), O (West Dep. 72:18-73:23, May 18, 2010), S (Stubblefield Dep. 83:23-84:9, May 24, 2010), X (Crowner Dep. 45:22-46:24, Jul. 5, 2010); and V (Cooper Dep. 195:17-196:11, June 8, 2010) (no control

with respect to INDEPENDENT FLORIDA AGRINET, FLORIDA AGRINET, SOUTHEAST AGRINET and/or ALABAMA/GEORGIA AGRINET).

55.     The danger of uncontrolled licensing arises from its ability to deceive the public because the public is no longer assured that the licensee's use of the mark accurately represents the trademark owner's connection with the goods or services sold under the licensed mark.  McCarthy § 18:48 at 18-101 to 102.  "'[I]t is well established that where a trademark owner engages in naked licensing, without any control over the quality of goods produced by the licensee, such a practice is *inherently deceptive* and constitutes abandonment of any rights to the trademark by the licensor.'"  *Barcamerica*, 289 F.3d at 598 (quoting *First Interstate Bancorp v. Stenquist*, 16 U.S.P.Q.2d 1704, No. C-89-4106, 1990 U.S. Dist. LEXIS 19426, at *7 (N.D. Cal. Jul. 13, 1990) and finding mark abandoned where license agreement contained no provision for quality control and mark owner played no "meaningful role" in the quality of goods and services for which mark was used).

56.     As set forth throughout this Motion, Plaintiff has thoroughly failed to adequately protect its rights in a number of major geographic regions, as evidenced by a number of entities' unlicensed and uncontrolled use of a number of different Agrinet Marks over the past three decades – in Alabama, Florida, Georgia, Kentucky, Oklahoma, Tennessee, Texas, and neighboring states of the foregoing states, and perhaps elsewhere. Plaintiff's failure to assert, much less protect, its alleged trademark rights has fatally damaged AGRINET's significance as an indicator of source or origin of goods or services. Plaintiff's own representative asserts that, today, when people hear AGRINET, they think of Clear Channel, which currently operates OKLAHOMA AGRINET and TENNESSEE AGRINET, and has operated AGRINET OF THE HIGH PLAINS in the recent past.  See Helm Decl. ¶ 4 & Ex. K (L. Ray Dep. 471:1-10, May 11, 2010).  Thus, according to Plaintiff, AGRINET has lost significance as an indicator that Plaintiff is the source or origin.

57.     Clear Channel's (and its predecessors') networks, on the other hand, have been known by a combination of AGRINET with a geographic modifier, consistently for various time periods and without any competing or infringing use of such names, over the course of the past three decades.

26

Plaintiff's failure to protect its rights, in conjunction with the loss of the mark's significance, results in trademark abandonment and Plaintiff's loss of rights in the mark. *Barcamerica*, 289 F.3d at 598 (citing McCarthy § 18:48 at 18-82).

58.     As set forth above, it is uncontested that various Agrinet Marks have been openly used by Clear Channel, its predecessors, and various other third parties over the past several decades. Such use has been reflected in publications commonly distributed to persons and entities in the farm broadcasting industry, as set forth above. This long-time usage by third parties has lead to the relevant public ceasing to associate the mark exclusively with Plaintiff. *See* Helm Decl. ¶ 4 & Exs. X (Crowner Dep. 13:6-7, 47:3-22, Jul. 5, 2010) (stating that witness was aware of the use of the term "Agrinet" by "many other organizations" and comparing exclusive rights in the term "Agrinet" to exclusive rights in "news"), S (Stubblefield Dep. 79:20-80:11, May 24, 2010) (witness was unaware of any rights in AGRINET or "anybody needing permission" to use AGRINET), O (West Dep. 56:8-57:15, May 18, 2010) (stating that Ron Hays would commonly refer to the Oklahoma Agrinet as "the Agrinet" beginning in the early 1980s), Q (Dain Dep. 25:2-18, May 19, 2010) (testifying that the Oklahoma Agrinet programs were branded with "just the term 'Agrinet'" prior to 2006), M (Hays Dep. 164:6-9, 168:5-21, 172:10-23, 177:17-178:8, 185:24-187:4, May 17, 2010) (discussing various uses of "Agrinet" alone to refer to the Oklahoma Agrinet), I (McGill Dep. 85:19-86:6, Feb. 23, 2010) (indicating that the term "Agrinet" does not have strong brand significance on its own), K (L. Ray Dep. 471:1-10, May 11, 2010) (stating her belief that advertising agencies associate OKLAHOMA AGRINET with Clear Channel, rather than Plaintiff), ¶9 & Exs. OO4 (NAFB Membership Directory, 1986) (identifying Dan Gordon, Tennessee Agrinet, as NAFB Southeast National Vice-President), OO5 (NAFB Membership Directory, 1991) (listing Ron Hays, Oklahoma Agrinet, as NAFB President), ¶ 10 (NAFB Membership Directory, 1993) (listing Gary Cooper, Southeast Agrinet, as NAFB Southeast Regional Vice President).

59.     Plaintiff has, ultimately, surrendered all rights in connection with its AGRINET mark.

C.      **In the alternative, Defendants are entitled to partial summary judgment dismissing Plaintiff's claims for monetary damages.**

60.      Finally, in the alternative, Plaintiff's inconsistent, incoherent, and speculative theory(ies) of damages are not sufficient for a jury to consider as the basis for any monetary award; consequently, in the alternative, Defendants seek partial summary judgment dismissing Plaintiff's claims for monetary relief.  As a general rule, damages in a trademark infringement case must be established with "reasonable certainty."  *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1407-08 (9th Cir. 1993) (superseded on other grounds).  The Supreme Court has held that "while damages are not rendered uncertain because they cannot be calculated with absolute exactness," a reasonable basis for computation must exist.  *Id.* (quoting *Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359, 379 (1927)).  *See generally Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d at 1407-08 (listing cases where monetary awards in infringement cases have been denied as remote and speculative).  *See also Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985) (explaining that a genuine issue of material fact cannot be created "through mere speculation").

## IV.      PRAYER

WHEREFORE, Defendants respectfully request that the Court enter judgment for Defendants as to all of Plaintiff's claims, based on the affirmative defenses of laches, acquiescence, and/or abandonment, and, in the alternative, that the Court dismiss all of Plaintiff's claims for monetary damages.  Defendants also ask that the Court determine that this case qualifies as an exceptional case pursuant to 15 U.S.C. § 1117, and award Defendants' their reasonable attorneys' fees from Plaintiff.  Defendants also request that the Court award Defendants such other and further relief to which they may be entitled.

Dated: August 9, 2010

Respectfully submitted,

/s/ Bart Huffman
Bart W. Huffman
Texas State Bar No. 00790930
bhuffman@coxsmith.com
Marissa Helm
Texas State Bar No. 24046273
mhelm@coxsmith.com
COX SMITH MATTHEWS INCORPORATED
112 E. Pecan St., Suite 1800
San Antonio, Texas 78205
Telephone: 210-554-5500
Facsimile: 210-226-8395

Eric P. Stevens
State Bar No. 17609
estevens@poynerspruill.com
POYNER SPRUILL, LLP
301 Fayetteville Street, Suite 1900
Raleigh, North Carolina 27601
Telephone: 919-783-1017
Facsimile: 919-783-1075
LR 83.1 Counsel

*Attorneys for Defendants*

## Certificate of Service

I hereby certify that, on August 9, 2010, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

Christopher J. Blake
Leslie Lane Mize
NELSON MULLINS RILEY &
SCARBOROUGH, LLP
GlenLake One, Suite 200
4140 Parklake Avenue
Raleigh, North Carolina 27612

Michael Culver
MILLEN WHITE ZELANO & BRANIGAN, PC
2200 Clarendon Blvd., Suite 1400
Arlington, Virginia 22201

/s/ Bart W. Huffman
Bart W. Huffman

29